**WENDELL v. CHICAGO, R. I. & P. R. CO.**

No. 10077.

United States Court of Appeals
Seventh Circuit.

Oct. 19, 1950.

Thomas I. Megan, Milton V. Thompson, Chicago, Ill., for appellant.

Bruneau E. Heirich, Robert J. Rafferty, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This action was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and the Safety Appliance Act, 45 U.S.C.A. § 1 et seq., for the recovery of damages occasioned by the death of Donald Q. Wendell, plaintiff's decedent, who was killed while acting as a brakeman in the employ of the defendant. The case was submitted to the jury solely on the allegations predicated upon the Federal Employers' Liability Act, the jury returned a verdict for the plaintiff, and the appeal comes to this court from the judgment entered thereon.

The contested issues raised by the defendant in this court are (1) that the District Court erred in overruling defendant's motion for a directed verdict and for judgment on the ground that there was no evidence of defendant's negligence, and (2) that the District Court erred in instructing the jury on allegations of the complaint not supported by evidence.

There is no dispute as to the evidence bearing upon the question of liability inasmuch as the sole testimony relied upon by the plaintiff is that contained in the deposition of Leonard B. Roberts, the conductor who was in charge of the train at the time of the fatal occurrence, which was read to the jury by plaintiff's counsel. The defendant offered no evidence. Plaintiff's decedent was killed on February 23, 1948. He was 21 years of age and had been in defendant's employ as a brakeman for about one month. On the day of his death he was acting as the head brakeman on a 90-car train which broke in two when a knuckle broke on the rear end of the 37th car just east of Geneseo, Illinois. The train was a freight train, eastbound, under the control of Roberts, the conductor, who was riding in the caboose. When the two sections of the train came to a stop, the decedent was riding on the engine and walked back to see what had happened, while Roberts walked forward for the same purpose. They met at the cross-over switches connecting the east- and westbound main line tracks and the westbound passing track.

The decedent, who had arrived on the scene before Roberts, had decided to set the damaged car out on the passing track and had secured the dispatcher's permission to do this after he had moved the front end of the train far enough to clear the electrical circuit at the cross-over so that the switches at the cross-over could be hand operated. It is uncertain whether the decedent unlocked the switchlocks, although it is inferable that he did. However, he did not throw any of the switches which would have permitted the front section to cross over the main lines to the passing track.

Roberts ascertained Wendell's plan and told him that a broken knuckle was not serious but a common occurrence upon freight trains. Roberts also asked the decedent if he knew how to make the repair, to which the latter replied that he had never experienced a broken knuckle before. Roberts then said to him, " * * * so I informed him that that would be a common repair that he had to make as a

.brakeman, and to come with me and I would teach him how to make the repair." Thereupon, the decedent's plan to set the car out was not followed. The repair was to be made right on the track by replacing the broken knuckle with a spare knuckle carried on the engine.

The two men walked eastward from the cross-over on the south side of the tracks toward the front section of the train, Roberts in front, followed by the decedent. The knuckles were heavy and Roberts informed decedent, " * * * it wouldn't be necessary for us to carry the knuckle, we would back the engine up, throw the knuckle on the ground and then pull that portion of the train up to where the knuckle was and we would apply it * . * *." When the two men were about three cars east of the rear end of the front section and still on the south side of the tracks, Roberts gave the engineer a back-up signal and, as the cars moved to the rear, the decedent ran back and rode on the end car. By the time Roberts realized that the decedent was gone he had moved two or three hundred feet away, so Roberts did not call out to him.

When the engine came back to Roberts, he and the engine crew threw the spare knuckle on the ground. The engine was then about 15 car lengths east of the cross-over, and the rear of the front section was about 10 car lengths from the rear or detached section of the train. By that time, three or four minutes had elapsed since the decedent had boarded the 37th car being pushed backward to the west.

The next train movement is the one of vital importance because undoubtedly it was during such movement that decedent was killed. Roberts instructed the engineer to move the front section forward to bring the car with the broken knuckle up to the point where the spare knuckle had been placed on the ground. At that time

he looked for the decedent and saw him walking eastward toward Roberts on the south side of the train. Decedent was at or near the cross-over, with the cars moving eastward, the end car being about 15 or 20 car lengths behind decedent. Roberts stooped down to adjust the position of the knuckle on the ground. He saw the decedent throw his fusee into the ditch along the right of way and after this move was made did not see Wendell alive again.[1]

When the rear car came up to where Roberts stood, he gave a stop signal to the engineer. He looked for the decedent but he was not in sight. Roberts then applied the spare knuckle to the 37th car and gave the engineer a back-up signal to bring the two sections of the train together. On this final move, Roberts rode the rear end of the rear car and as they neared the cross-over he saw a shadow between the tracks in the cross-over, which, as the train came closer, was found to be the dead body of the decedent. There had been an interval of about ten minutes between the time Roberts last saw decedent alive and the time he first saw his dead body.

The undertaker determined that the decedent had a small skull fracture above the left eye, deep gashes in the back of his head and crushing injuries to his left arm, head and left side of his chest.

We have much difficulty in discerning either from plaintiff's brief or from counsel's oral argument the negligence relied upon which would justify the case being submitted to the jury. The only certain thing is that decedent was struck or run over by the cars and killed. As to how or where he was in a position to meet such fate is a matter of pure speculation. It is inferable, of course, that he attempted to cross over or between the moving cars in order to lock the switch on the opposite

1. Defendant contends that at the time Roberts last saw the decedent in a place of safety the train was moving. Plaintiff argues, however, that it may be inferred that the decedent was last seen just prior to the time Roberts gave the signal for the train to move. While Roberts' testimony on this point is not entirely certain, the almost irresistible inference is that the train at that time was moving. At any rate, there is no dispute but that the decedent was on the south side of the train, about midway between the engine and the 37th car and, of course, in a place of safety.

side and while doing so fell under. It is equally inferable that he got on a car of the moving train for the purpose of riding up to the point where Roberts was located, and fell under the moving train. Much is said about the complicated nature of the train movement and the decedent's inexperience as a brakeman. We do not, however, see anything complicated about the movements above described. In fact, we would think they were about as simple as train movements could be, and certainly inexperience could not relieve decedent of knowledge that the operation and movement of trains was attended with danger. When the movement which resulted in the fatality was initiated by Roberts, the latter knew the decedent was in a place of safety. The decedent at that time knew that the train was in motion or that it would be immediately placed in motion. More than that, he had shortly before been told by Roberts of the program to be employed and the train movements which would be necessary in its execution.

Under the circumstances related, what possible negligence could be attributed to Roberts? In attempting to answer this question, the nearest approach made by the plaintiff in her brief is contained in the following statement: "We submit that in the instant case the accident in question could easily have been eliminated by stopping the train movement when Wendell's location was unknown as it was for about ten minutes or by Roberts telling him where to station himself as required by company rules." Any logic in the first part of this statement is dissipated by the fact that it was only ten minutes from the time Roberts gave the forward signal (at which time he observed the decedent in a place of safety) to the time when the coupler had been repaired and he was ready to give the signal for the back-up movement. It must be certain that the decedent was killed as the train moved forward, and while the record does not show, this undoubtedly could not have consumed more than a small fraction of the ten minute period, so the decedent must have been killed within a very few minutes from the time he was last seen in a place of safety by Roberts. We can see no basis for the assertion that there was any duty to stop the train during that short interval. It would be just as reasonable to argue that the accident could have been eliminated by permitting the train to remain in a stationary position.

■■ The asserted duty of Roberts to inform decedent where to station himself is based on the following rule: "Conductors must instruct their brakemen as to their duties and caution them as to the dangers of their employment. They must also instruct them where to station themselves, particularly on curves, so they may be able to observe condition of equipment in their train." In our view, this rule has no application to the instant situation. As noted, Roberts had informed the decedent as to the proper manner of repairing a broken knuckle and the procedure to be employed. We think there was no duty on the part of Roberts to caution decedent as to that which was obvious, that is, the danger of a moving train. Neither was there any occasion for Roberts to instruct the decedent where to station himself so that he might be able to observe the condition of equipment in the train. Roberts saw the decedent in a place of safety when the train movement was initiated and had a right to assume that he would remain in a place of safety as the train moved forward.

■■ Each of the parties cites a number of cases on the question as to when a case of this character should or should not be taken from the jury. We think no useful purpose could be served in discussing or analyzing these cases because each case must stand upon its own particular facts. Admittedly, there must be proof of the defendant's negligence which is the proximate cause of the employee's injury or death. Otherwise, the defendant is entitled to a directed verdict. In our view, the record is barren of any proof of negligence which would warrant the submission of the case to the jury, and it follows that there should have been a directed verdict for the defendant.

The judgment is

Reversed.